*7/22/2013 I have reviewed the objection to the Report but find it unpersuasive. I accept the Recommendation and adopt the Report as the opinion of the Court. The plaintiff's motion for summary judgment is DENIED. The Commissioner's cross motion is GRANTED.*

*The complaint is DISMISSED.*

*Colleen McMahon USDJ*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------X

JOE H. COOKE, JR.,

          **Plaintiff,**

-against-   **MEMO ENDORSED**

MICHAEL J. ASTRUE,
**Commissioner of Social Security,**

          **Defendant.**

------------------------------------------------X

**REPORT AND**
**RECOMMENDATION**
08 Civ. 11044 (CM)(LMS)

**TO:   THE HONORABLE COLLEEN MCMAHON U.S.D.J.**

      Joe H. Cooke, Jr. brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial

review of the final decision of the Commissioner of Social Security (the "Commissioner"),

which found that Plaintiff was not entitled to a period of disability and disability insurance

benefits under the Social Security Act (the "Act").  Currently pending before the Court are

Plaintiff's motion, and the Commissioner's cross-motion, for judgment on the pleadings pursuant

to Rule 12(c) of the Federal Rules of Civil Procedure.  Docket ## 12, 13, 14, 15.  Because I find

that the Commissioner's decision regarding Plaintiff's claims applied the correct legal standards

and is supported by substantial evidence, I conclude, and respectfully recommend that Your

Honor should conclude, that Plaintiff's motion should be denied, the Commissioner's cross-

motion should be granted, and the case should be dismissed.

**I.   BACKGROUND**

      **A.   Procedural History**

      On May 13, 1999, Plaintiff filed an application for a period of disability and disability

insurance benefits, claiming disability beginning April 2, 1999, because of a work-related injury.

Administrative Record ("AR") 33, 105, 484.[1]  The Social Security Administration ("SSA")

denied Plaintiff's application for disability insurance benefits, and Plaintiff did not appeal. Id.

10, 57, 68-71.  Plaintiff filed another application on February 25, 2000, which the SSA also

denied, both initially and upon reconsideration, and once again, Plaintiff did not appeal. Id. 10,

58, 61, 72-78, 114-17.  On December 12, 2000, Plaintiff filed yet another application, which the

SSA denied, and Plaintiff requested an Administrative Law Judge ("ALJ") hearing to review the

decision.  Id. 10, 83-86, 118-20.  After the hearing on February 20, 2002, id. 18-55, the ALJ

issued a decision on July 23, 2002, finding that Plaintiff was not disabled within the meaning of

the Act and denying his claims. Id. 7-17.  Plaintiff requested that the Appeals Council review

the ALJ's decision, but on June 30, 2004, the Appeals Council denied his request. Id. 4-6A.

　　　Plaintiff then brought a civil action in the United States District Court for the Southern

District of New York to appeal the ALJ's decision. Id. 338.  By stipulation and order, the district

court remanded the case to the Commissioner. Id. 371-72.  On November 17, 2005, the Appeals

Council issued a Remand Order. Id. 366-68.  Upon remand, the ALJ held hearings on October

12, 2006, and April 19, 2007, in White Plains, New York. Id. 477-508.  At the hearing on April

19, 2007, Plaintiff acknowledged that he worked from November 16, 2004, to April 19, 2006,

and therefore, he was alleging disability from April 2, 1999, to November 16, 2004, and

continuously from April 19, 2006. Id. 481-84, 488-89.  On April 27, 2007, the ALJ determined

that Plaintiff was not disabled within the meaning of the Act. Id. 335-48.  After the Appeals

---

[1]Plaintiff initially filed for disability insurance benefits on February 24, 1993, based on
back and right leg injuries suffered at work on February 11, 1993, and was awarded benefits by
virtue of a decision issued on June 9, 1994. AR 10, 27-28.  On April 24, 1998, the Social
Security Administration proposed a cessation in benefits based on Plaintiff's medical
improvement. Id. 10.

Council declined to assume jurisdiction over Plaintiff's case on October 14, 2008, the ALJ's decision on April 27, 2007, became the final decision of the Commissioner. Id. 329-32.

On December 19, 2008, Plaintiff commenced the instant action in this Court (Docket # 1), alleging that the ALJ wrongly denied him disability insurance benefits. The Commissioner filed his Answer (Docket # 5) on April 16, 2009, claiming that the ALJ's decision should be affirmed because the Commissioner's decision was supported by substantial evidence. On August 12, 2009, Plaintiff filed a motion for judgment on the pleadings, arguing that the Commissioner's decision was not supported by substantial evidence and that the Commissioner did not apply the correct legal standards. Docket ## 12, 13. On September 10, 2009, the Commissioner filed a cross-motion for judgment on the pleadings, again arguing that the Commissioner's decision was supported by substantial evidence. Docket ## 14, 15.

**B.   Medical Evidence Presented to the ALJ**

**1.   Evidence from Plaintiff's Treating Physicians**

On April 3, 1999, Plaintiff went to Nyack Hospital, claiming that he had injured his back at work the day before. AR 241-44. A doctor diagnosed Plaintiff as having acute lumbar strain with radicular pain and prescribed pain medication. Id. 241-43. Plaintiff was told to avoid strenuous activity and heavy lifting and was given a note providing a two-day medical excuse from work. Id. On April 5, 1999, Plaintiff began going to a chiropractor, Dr. John P. Hilley, for his spinal injuries. Id. 427.[2] Dr. Hilley took x-rays of Plaintiff which showed "mild

---

[2] Dr. Hilley did not respond to either the ALJ's or the SSA's earlier requests for medical records. AR 59-60, 62, 65, 414. A March 27, 2001, Explanation of Determination that Plaintiff was not disabled notes that the State agency deciding Plaintiff's claim had, among other things, a 1/12/01 report from Dr. Hilley, see id. 82, but this report is not in the Administrative Record submitted to the Court.

degenerative changes in [Plaintiff's] L5, S1 disc." Id. 256.

On April 22, 1999, Dr. Louis M. Starace of Ramapo Orthopedic Associates examined Plaintiff and diagnosed him with acute lumbar strain, noting that there was no visible soft tissue swelling, ecchymosis, or deformity in Plaintiff's lower back, but that there was tenderness in his lumbosacral spine and a limited range of motion. Id. 257-58.[3] Plaintiff also had a positive seated straight leg raise bilaterally. Id. 258. However, Plaintiff did not have any objective, motor, sensory, or deep tendon reflex deficits. Id. At subsequent appointments, Plaintiff reported to Dr. Starace that he was experiencing lower back pain radiating into both of his legs. Id. 253-56. He was also experiencing numbness and tingling across his lower back, as well as in his legs and his right hand. Id. 251-56. Dr. Starace prescribed medication and physical therapy. Id. 253, 255-56. Dr. Starace also noted that Plaintiff was receiving chiropractic care. Id. 252, 256, 258. Dr. Starace reported that Plaintiff was disabled from his heavy work as a sanitation worker. Id. 251, 254, 255, 258. At Plaintiff's final appointment on December 14, 1999, Dr. Starace noted that Plaintiff was "neurovascularly unchanged." Id. 251.

Plaintiff's chiropractor, Dr. Hilley, referred Plaintiff to Dr. Annarose Polifrone, a specialist in physical medicine and rehabilitation. Id. 295. At his initial appointment on December 2, 1999, Plaintiff complained that he suffered from low back pain radiating into both of his legs with numbness and tingling, as well as mid back pain, headaches, and localized neck pain. Id. 296. Dr. Polifrone examined Plaintiff and noted spasm and tenderness upon palpation of Plaintiff's neck muscles bilaterally and "restricted [movement] in lateral bending and rotation,

---

[3] Dr. Starace also diagnosed Plaintiff with a contusion of the left elbow. On February 23, 1999, Plaintiff was treated at Nyack Hospital for a contusion of the left elbow resulting from an on-the-job injury. AR 245-50.

secondary to pain." Id. 297. Dr. Polifrone also found that there was spasm on palpation of muscles in Plaintiff's mid and lower back and that there was a decrease in Plaintiff's lumbar lordotic curve. Id. Plaintiff's lower back movement was "restricted in all extension and side bending, secondary to pain," and his straight leg raise was positive bilaterally. Id. However, Plaintiff had good muscle strength and no muscle atrophy. Id. Plaintiff had a decreased sensation to pin prick in the L4 dermatome on the right, as well as a decreased knee reflex on the right. Id. Dr. Polifrone diagnosed Plaintiff as having a lumbosacral injury, rule out herniated disk at L4-5 with L4 radiculopathy, and cervical and thoracic sprains. Id. Dr. Polifrone prescribed Ambien for sleep and Darvocet for pain and advised Plaintiff to continue with chiropractic care. Id. 298. She requested authorizations for NCV/EMG studies of both lower extremities in order to rule out radiculopathy, as well as for an MRI of Plaintiff's cervical and lumbrosacral spines. Id. Toward the end of December, 1999, Plaintiff began receiving physical therapy in Dr. Polifrone's office. Id. 318-19.

An MRI of Plaintiff's lumbar spine that had been ordered by Dr. Starace was performed by Drs. Michele Mahn and Andrew G. Schechter on February 15, 2000. Id. 301. The MRI showed a right paracentral disc herniation at L5-S1 with "no significant change" since an MRI performed in 1994. Id. A November 6, 2000, MRI of the lumbosacral spine showed a small central posterior disc herniation at the L5-S1 level,[4] and a November 20, 2000, MRI of the cervical spine showed that Plaintiff had a central posterior disc herniation at the C3-C4 level. Id. 299-300.

On May 15, 2000, Dr. Starace reported that he had not seen Plaintiff since December,

---

[4]This MRI showed no change from prior MRIs done on February 1, 1994, and February 15, 2000.  AR 286.

1999, at which time Plaintiff was "completely disabled from doing his past work." Id. 274.

Meanwhile, Plaintiff saw Dr. Polifrone as his treating physician every one to two months from

2000 through May, 2004. Id. 285-92, 431-40. In treatment notes from office visits in 2000, Dr.

Polifrone reported that Plaintiff was experiencing spasms and pain in his neck and lower back

and was continuing to take Ambien as well as Vicodin and to receive physical therapy. Id. 286-

90. Dr. Polifrone's notes from appointments with Plaintiff on January 19, March 23, and May

24, 2001, all state that Plaintiff's physical examination was unchanged. Id. 439-40. On June 29,

2001, however, Plaintiff had pain and spasm upon palpation of the muscles in the neck and lower

back with a decreased range of motion due to pain. Id. 439. Plaintiff also experienced decreased

sensation in the L4 dermatone on the right, decreased sensation in the C4 dermatone bilaterally,

and decreased right knee reflex. Id. Progress notes from July 26, 2001, and September 21,

2001, note that Plaintiff's physical examination was unchanged. Id. 438. Medication, physical

therapy, and chiropractic care were all helping Plaintiff to deal with his symptoms. Id. 438-40.

Dr. Polifrone noted that Plaintiff's neck and back pain continued, which made sleeping difficult

for Plaintiff, and that Plaintiff also had headaches. Id. 438. She prescribed a soft cervical collar

for Plaintiff's neck. Id. Also on September 21, 2001, Dr. Polifrone submitted a form to the

Workers' Compensation Board which noted that Plaintiff was "disabled from regular duties or

work." Id. 323.

Dr. Polifrone referred Plaintiff to neurosurgeon Dr. Jack Stern, who saw Plaintiff on

October 5, 2001, and reported a "non-focal examination," noting that Plaintiff's MRI showed a

small disc herniation at C3-C4, which he "would be hard put to ascribe to [Plaintiff's]

symptoms." Id. 443. On November 15, 2001, Plaintiff underwent another MRI of his cervical

spine, which showed a posterior annular bulge at C6-7 and a decrease of the usual lordotic curve,

6

but no disc herniation. Id. 437, 444.

On January 16, 2002, Dr. Polifrone performed nerve conduction velocity and electromyography studies of Plaintiff's bilateral upper extremities and found that Plaintiff tested negative for cervical radiculopathy and neuropathy. Id. 437, 441-42. Plaintiff continued to see Dr. Polifrone every couple of months throughout 2002. Id. 435-37. Plaintiff continued to experience lower back pain radiating into his legs, neck pain, and headaches, as well as spasms and pain upon palpation of the muscles of the neck and lower back with decreased range of motion due to pain. Id. Plaintiff wore the cervical collar prescribed by Dr. Polifrone, did home exercises, and continued with physical therapy and pain medication. Id. In the fall of 2002, Plaintiff developed bilateral TMJ problems due to his chronic neck problems and was referred to an oral surgeon. Id. 436, 445.

Plaintiff continued to see Dr. Polifrone every couple of months throughout 2003. Id. 432-35. On February 12, 2003, Dr. Polifrone reported that Plaintiff continued to experience neck pain, headaches, and lower back pain and that Plaintiff's neck and lower back pain "radiate[d] into [his] arms and legs." Id. 435. Plaintiff's symptoms remained mostly unchanged, and he continued to take pain medication and receive chiropractic care, which seemed to provide relief. Id. 432-35.

Plaintiff saw Dr. Polifrone up through May 12, 2004, during which time his physical examination remained unchanged. Id. 431-32. Plaintiff continued with pain medication and chiropractic care, as well as home exercises. Id. Dr. Polifrone stopped treating Plaintiff until February, 2007. Id. 431.

Plaintiff resumed working in November, 2004, id. 481-84, 488-89, and there is no evidence of medical treatment again until April, 2006. On April 19, 2006, Dr. Janet A. Gerard, a

7

chiropractor in Dr. Hilley's office, gave Plaintiff a one-day medical excuse to miss work due to lower back and cervical strain/sprain and muscle spasms. Id. 464. On October 7, 2006, Plaintiff went to Nyack Hospital, where a doctor prescribed Flexeril, Hydrocodone, and Motrin for Plaintiff's chronic back pain. Id. 428-29. A letter from Dr. Hilley on October 12, 2006, discussed Plaintiff's chronic back pain, noting that Plaintiff "suffer[ed] with pain daily and receive[d] moderate relief with chiropractic adjustments," but that Plaintiff would continue to suffer from chronic pain. Id. 427. Plaintiff had stopped seeing Dr. Hilley in the middle of 2006. Id. 499.

On February 22, 2007, Dr. Polifrone began treating Plaintiff again. Id. 431, 459.[5] Dr. Polifrone noted that since Plaintiff's last visit with her in 2004, Plaintiff had continued chiropractic care with Dr. Hilley. Id.[6] Plaintiff had been taking Motrin, but he had to stop because it was bothering his stomach and not helping to control his pain. Id. Plaintiff told Dr. Polifrone that although he had gone back to work for about a year, he missed days due to continued symptoms and ultimately had to stop working due to continued pain. Id. Plaintiff complained of neck pain that radiated into his arms, lower back pain that radiated into his legs, numbness in the toes of his right foot, and right shoulder pain. Id. Plaintiff walked with a slight limp due to his lower back pain and had spasm and tenderness upon palpation of the muscles in his neck and lower back with decreased range of motion due to pain. Id. Plaintiff suffered pain upon palpation of the bicipital groove and acromioclavicular tip of the right shoulder, with

---

[5]Plaintiff testified at the administrative hearing on April 19, 2007, that during the period from 2004 to 2007 in which he did not see Dr. Polifrone, he was just taking over-the-counter medications. AR 501.

[6]Plaintiff testified at the administrative hearing that he stopped treating with Dr. Hilley in the middle of 2006. AR 499.

decreased range of motion due to pain. Id. Plaintiff had decreased right knee and Achilles reflexes and stood with a pelvic tilt due to lower back pain. Id. Dr. Polifrone prescribed Vicodin and told Plaintiff to continue with chiropractic care. Id. She noted that Plaintiff may need updated MRIs of his cervical and lumbar spines and his right shoulder. Id.

On April 5, 2007, Dr. Polifrone provided a statement of Plaintiff's ability to do physical activities. Id. 450-56. She concluded that Plaintiff could lift or carry up to 10 pounds occasionally and that during an 8-hour work day Plaintiff could sit 30 minutes, stand 15 minutes, and walk 15 minutes at one time, but he must be able to change his position as needed based on his pain. Id. 450-51. Among Plaintiff's various other limitations, Dr. Polifrone noted that Plaintiff could never reach overhead or push/pull, could occasionally do all other kinds of reaching, and could frequently engage in handling, fingering, and feeling. Id. 452. Plaintiff could never operate foot controls with his right foot and could only do so occasionally with his left foot. Id. Plaintiff could occasionally climb stairs and ramps and kneel, but he could never climb ladders or scaffolds, balance, stoop, or crouch. Id. 453. Dr. Polifrone noted that Plaintiff had experienced all of his limitations since April 2, 1999. Id. 455.

### 2. Evidence from Consultative Physicians/ State Agency Medical Consultants

On June 8, 1999, Plaintiff visited consultative physician Dr. Vijaya Doddi, who conducted an orthopedic examination. Id. 259-61. Plaintiff told Dr. Doddi that he had mid and lower back pain that radiated into his legs, pain in his left elbow, and mild neck pain. Id. 259. Plaintiff was taking Ibuprofen and Cyclobenzaprine and was receiving chiropractic treatment for his pain. Id. Plaintiff reported that he was basically independent in his activities of daily living and that his girlfriend helped him with heavy chores. Id. 259-60. Plaintiff could drive short

9

distances but not long distances because of his chronic back pain. Id. 260. Dr. Doddi reported

that Plaintiff could get on and off the examination table, change for the examination, and walk

slowly without any assistance. Id. Plaintiff had normal flexion, extension, lateral flexion, and

lateral rotation in his cervical spine, with no cervical or paracervical pain or spasm. Id. Plaintiff

had a full range of motion in the joints in his upper extremities, and his fine motor skills were

intact and normal on both sides, except for the loss of half a distal phalanx on the right thumb

which had occurred well before 1999. Id. 42, 259-60. All of the joints in Plaintiff's lower

extremities had a full range of motion, and there was no significant muscle atrophy. Id. 261.

Examination of the lumbar spine revealed flexion to 60 degrees, but there was significant

tenderness in the mid-thoracic area, with no spasm, and mild tenderness in the lumbosacral area

on both sides. Id. 260-61. At the same appointment, radiologist Dr. Pesho S. Kotval examined

x-rays of Plaintiff's cervical and lumbar sacral spines and discovered that Plaintiff's cervical

lordotic curve was straightened, that the disc spaces at C6-7 and L5-S1 on Plaintiff's spine had

narrowed, and that there were mild degenerative changes. Id. 262.

        Dr. Doddi concluded that Plaintiff had "chronic low back pain with possible mild

radiculopathy but [the] pain [wa]s unusually more significant in the middle of the spine, in the

thoracic area more than the lumbosacral area." Id. 261. Dr. Doddi recommended an MRI of

Plaintiff's thoracic spine. Id. Dr. Doddi opined that Plaintiff could do "light lifting, pulling,

pushing and carrying with proper biomechanics with frequent rest periods." Id.

        On June 24, 1999, a state agency medical consultant completed a Physical Residual

Functional Capacity Assessment of Plaintiff. Id. 263-70. The medical consultant found that

Plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently, could stand

and/or walk 6 hours in an 8-hour workday, could sit 6 hours in an 8-hour workday, and was

10

unlimited in his ability to push and/or pull. Id. 264. The consultant also found that Plaintiff

could occasionally climb, balance, stoop, kneel, crouch, and crawl and that he did not have any

manipulative, visual, communicative, or environmental limitations. Id. 266-68. The medical

consultant concluded that Plaintiff was not disabled and had the residual functional capacity to

perform light work. Id. 270.

On March 23, 2000, Dr. Michael D. Robinson performed a consultative examination of

Plaintiff. Id. 271-72. Plaintiff told Dr. Robinson that he suffered from persistent pain in the

right iliolumbar region, which was exacerbated by sitting and standing. Id. 271. Plaintiff also

reported that he was able to perform activities of daily living independently and could drive short

distances independently as well. Id. Plaintiff was taking Tylenol # 3 on an as-needed basis. Id.

272.

Upon examination, Plaintiff walked with a wide-based, antalgic, slow gait. Id. Plaintiff

was hypersensitive to touch of the lumbar region, but strength was normal in all muscle groups

in the lower extremities, and there was no muscle atrophy in the upper or lower extremities. Id.

Cervical range of motion was full, and range of motion in the upper and lower extremities was

within normal limits. Id. Lumbar range of motion was limited with pain at the end ranges of

motion. Id. Straight leg raising in the sitting position was negative. Id. In the supine position,

Plaintiff felt discomfort in the lower back at 10 degrees. Id. Plaintiff was able to dress and

undress independently, although he needed help tying his shoes, and he was able to walk without

assistive devices or braces. Id.

Dr. Robinson determined that Plaintiff had symptoms of subacute low back pain likely

due to an annular tear and degenerative disk and joint disease in the lower lumbar region. Id.

However, he noted that there was no evidence of neurologic deficit and that Plaintiff's

11

presentation was "significantly out of proportion to what would be anticipated from his physical exam and the MRI results." Id. Dr. Robinson opined that Plaintiff would have "minimal limitations in regard to climbing, sitting, walking, standing, lifting and carrying and no significant limitations in regard [to] handling, hearing or speaking." Id.

On May 16, 2000, a state agency medical consultant, Dr. Judith Bodnar, completed a second Physical Residual Functional Capacity Assessment of Plaintiff. Id. 275-82. She concluded that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds, could stand and/or walk for 6 hours in an 8-hour workday, could sit for 6 hours in an 8-hour workday, and was unlimited in his ability to push and/or pull. Id. 276. Dr. Bodnar noted that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl, but that he did not have any manipulative, visual, communicative, or environmental limitations. Id. 277-79. Dr. Alan Auerbach, another state agency medical consultant, reviewed all the evidence in the file and affirmed Dr. Bodnar's findings on June 30, 2000. Id. 282.[7]

On December 20, 2000, a chiropractor, Dr. Michael Cocilovo, evaluated Plaintiff for the New York State Insurance Fund. Id. 302-05. As of that date, Plaintiff reported that he was still

_____

[7]On March 26, 2001, another Physical Residual Functional Capacity Assessment was provided by a state agency adjudicator. AR 310-17. The adjudicator determined that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds, could stand and/or walk for at least 2 hours in an 8-hour workday, could sit for 6 hours in an 8-hour workday, and was unlimited in his ability to push and/or pull. Id. 311. The adjudicator also determined that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl, but that he did not have any manipulative, visual, communicative, or environmental limitations. Id. 312-14. In conclusion, the adjudicator noted that while Plaintiff stated that he could not work "due to low back pain radiating to legs and causing the legs to give out if he tries to stand very long," Plaintiff could "drive and take public transportation alone, manage[] his money, do[] his own bathing, grooming, and personal hygiene, pay[] bills, watch[] T.V., radio, socialize[] [with] family." Id. 315. The adjudicator found that in light of the physical findings and in consideration of Plaintiff's pain, Plaintiff's statements were only "partially credible." Id.

seeing Dr. Hilley three times a week for chiropractic care and was receiving pain medication from Dr. Polifrone. Id. 302. Upon examination, Dr. Cocilovo reported that Plaintiff had no difficulty sitting and could stand and walk with mild forward antalgia. Id. 303. Plaintiff was found to have a limited range of motion and pain in his cervical and lumbar spines. Id. Motor examination of the upper and lower extremities revealed full strength; sensory examination of the upper and lower extremities was within normal limits; and deep tendon reflexes of the upper and lower extremities were plus two. Id. Based on his physical examination and review of medical records, Dr. Cocilovo diagnosed Plaintiff with chronic cervical sprain/strain associated with disc herniation at the C3-C4 level and chronic lumbar sprain/strain associated with disc herniation at the L5-S1 level. Id. 304. He believed that Plaintiff had achieved maximum chiropractic improvement for his condition and that no further chiropractic care was warranted. Id. Dr. Cocilovo concluded, in accordance with the Workers' Compensation Board Medical Guidelines and the objective findings of his examination, that Plaintiff had a moderate partial spinal disability. Id.

On January 23, 2001, Dr. Kautilya Puri conducted a consultative neurological examination of Plaintiff. Id. 306-09. With respect to activities of daily living, Plaintiff reported to Dr. Puri that he took the bus to his appointment and that he can drive and use public transportation, but he stated that he could not cook, clean, do laundry, or shop for food and clothing because of the pain and that he could not stand for long periods of time. Id. 307. Plaintiff said he can take care of his personal hygiene with some help. Id. According to Dr. Puri, Plaintiff walked with a stooped normal gait and was unable to walk on his heels or toes due to lower back pain, but he could change for the examination and get on and off of the examination table by himself. Id. Plaintiff had a normal range of motion in his neck and upper

13

extremities; he had full strength and no sensory deficit in his upper extremities. Id. 308.

Plaintiff had decreased range of motion in his lumbar spine, with some spinal tenderness but no

muscle spasm. Id. Plaintiff's straight leg raising was negative bilaterally. Id. There was no

sensory deficit in the lower extremities, except for a mild decrease in sensation to pinprick on the

right leg, and muscle strength was full. Id.

Dr. Puri diagnosed Plaintiff as having low back pain, radiculopathy, and neck pain. Id.

He opined that Plaintiff should not carry heavy loads or any loads on his shoulder or neck and

that Plaintiff had mild to moderate limitations in ambulation. Id. 309. Dr. Puri further opined

that Plaintiff had "no obvious limitations to a sedentary work lifestyle." Id.

On June 29, 2006, Dr. Ronald L. Mann conducted a consultative orthopedic examination

of Plaintiff. Id. 420-22. Plaintiff reported that he had pain in his lower back with numbness and

tingling in both legs; soreness in his cervical spine radiating into his face and right arm and

shoulder; and soreness in his right shoulder with motion and numbness and tingling in the right

and lateral aspect of his arm. Id. 420-21. Plaintiff stated that he was not taking any medications

for these conditions. Id. 421. Upon examination, Dr. Mann noted that Plaintiff had a slow, stiff

gait, with slight limping on the right side, and he was able to stand on his toes and heels. Id.

Plaintiff had limited ranges of motion of his lumbar and cervical spines and "appeared to be in

acute pain throughout the exam with respect to his lumbar spine." Id. Plaintiff had full range of

motion in his upper and lower extremities. Id. Dr. Mann noted that Plaintiff had a "markedly

positive right straight leg raising examination with cross straight leg raising from the left side

when lying down and sitting up." Id. Plaintiff had 5 plus motor strength in his upper and lower

extremities. Id. Sensation was intact, but no reflexes could be elicited in either the upper or

lower extremities. Id. 422. There were no muscle atrophies. Id.

14

Dr. Mann diagnosed Plaintiff with lumbar radiculopathy with a positive straight leg raising examination and severe cervical strain, as well as status post partial amputation of the distal tip of the right thumb. Id. Dr. Mann also completed a residual functional capacity assessment of Plaintiff and opined that Plaintiff could occasionally lift 10 pounds and frequently lift less than 10 pounds, could stand and/or walk for at least 2 hours in an 8-hour workday, had to periodically alternate sitting and standing to relieve pain, and was limited in the lower extremities in his ability to push and/or pull due to lumbar radiculopathy. Id. 423-24. Dr. Mann also opined that Plaintiff could occasionally climb and balance but could never kneel, crouch, crawl, or stoop due to stiffness and pain in his lumbar spine. Id. 424. However, Plaintiff did not have any manipulative, visual/communicative, or environmental limitations. Id. 425-26.

### C.   Other Evidence

Plaintiff was born on April 23, 1958, and completed the tenth or eleventh grade of high school. Id. 22-23, 161, 189, 209. He has difficulty reading. Id. 24. He worked in landscaping from 1979 to 1989 and again from 1991 to 1995. Id. 216.[8] Plaintiff worked in sanitation from 1997 to 1999. Id. 156, 164, 184, 204. Both of these jobs required lifting 100 pounds or more. Id. 156, 165-66, 184, 204, 217, 219. From November, 2004, to April, 2006, Plaintiff worked on an assembly line as a tent part assembler. Id. 382-83, 419, 481-84, 488-89. This job was primarily done while standing. Id. 488-89.

At the hearing before the ALJ on February 20, 2002, Plaintiff testified that he was

---

[8]One of the disability reports completed by Plaintiff states that he worked in landscaping starting in 1970, AR 204, but that seems highly unlikely, since he was only 12 years old at that time. Another report in the record that was filled out by Plaintiff states that he began working in landscaping in 1976. Id. 419. In addition, due to an earlier injury, Plaintiff did not work in 1994 and 1995. See footnote 1, supra; AR 136, 148, 378, 387 (showing no earnings/no employment in 1994 and 1995).

working as a sanitation worker in April, 1999 when he injured his right leg lifting a heavy barrel. Id. 33-34. Plaintiff testified that he had pain in his back running down into his legs, as well as neck pain and headaches. Id. 36-37, 49-53. Plaintiff stated that he could stand for four to five minutes, but if he stood too long he got a "numb feeling" in the lower part of his back and into his calves and feet. Id. 41, 50. He could also sit anywhere from two to four minutes before his legs cramped up and his back felt numb with pain. Id. 40, 50. Plaintiff claimed that as a result, he spent approximately 80% of the day lying down, even though he used to be active and play basketball and jog. Id. 54. Plaintiff testified that he received chiropractic care, was prescribed a cervical collar which he wore "all the time," including at the hearing, and received physical therapy. Id. 36-37, 39, 49. Plaintiff said that he also took medication – Hydroco, a generic form of Vicodin, for pain relief, and Ambien, a sleep aid. Id. 37-38. Plaintiff reported that he had difficulty sleeping during the day and at night, even though he was taking sleeping pills, because the pain would overwhelm him and wake him up. Id. 38, 50-51. According to Plaintiff, he suffered from headaches that could last all day, which caused severe pain, dizziness, and nausea. Id. 51-53. Plaintiff would lie down with an ice pack or a heat pack and prop his legs up or take Hydroco to ease the pain from the headaches. Id. 38, 52-53.

Plaintiff testified that he lived with his girlfriend and relied on her to help him dress and bathe. Id. 44-45. His girlfriend cleaned the house, washed the dishes, and did the cooking and laundry. Id. 45-46. Plaintiff testified that he lived with two of his children, who he said did other chores around the house. Id. 21, 47. Plaintiff claimed that half a gallon of milk was too heavy for him to lift and that he could not reach overhead. Id. 41-42. Plaintiff could only walk 100-150 feet before taking a break and because Plaintiff would not drive, he took the bus to get to his doctors' appointments and had a friend drive him to the hearing. Id. 41, 47-48.

16

At the hearing before the ALJ on April 19, 2007, Plaintiff admitted that he had worked from November 16, 2004, to April 19, 2006, and therefore, that he was alleging disability from April 2, 1999, to November 16, 2004, and continuously from April 19, 2006. Id. 481-84, 488-89. Plaintiff updated his testimony since the hearing on February 20, 2002. Id. 485. Plaintiff stated that his pain worsened in 2002 and then remained the same in 2003 and that he continued to take pain medication. Id. 486. Plaintiff testified that he went back to work in November, 2004, because a doctor at Helen Hayes Hospital told him that he was faking his pain. Id. 487. Plaintiff had to stop working as a tent part assembler in April, 2006, due to a right rotator cuff injury sustained while working. Id. 489-90. Plaintiff claimed that while he worked on the assembly line, his neck, back, and legs were in pain and that medication did not help. Id. 490-91. After Plaintiff stopped working as a tent part assembler, he continued to experience neck and back pain and took Oxycodone and spent most of his time sleeping. Id. 493-94, 498. He complained of trouble sleeping, sitting, standing, walking, bending, and lifting. Id. 494-97.

**D.   Medical Evidence Presented to the Appeals Council**

In a June 22, 2007, submission to the Appeals Council, Plaintiff provided a report of a lower extremity electrodiagnostic study that was ordered by Dr. Starace and conducted on January 5, 2000. Id. 471-72. In conclusion, the report notes that findings "may be suggestive of a right L4 and/or L5 radiculopathy," but there was no evidence of peripheral neuropathy on both lower extremities. Id. 472.

**E.   Medical Evidence Presented to the Court**

Plaintiff appended additional medical records to his motion papers submitted to the Court. Thus, Plaintiff provided an October 9, 2008, report from Dr. Polifrone in which she stated that Plaintiff was moderately limited in walking, standing, sitting, and using his hands, but

17

very limited in lifting, carrying, pushing, pulling, bending, stairs or other climbing, and coping

with environmental changes. Docket # 13 Attachment at 1. Dr. Polifrone concluded that

Plaintiff's condition was permanent and that he was "totally disabled for work." Id. at 2. Dr.

Polifrone also had MRIs taken of Plaintiff on April 11, 2008, and April 26, 2008. Id. at 3-7. The

April 11 MRI of the left shoulder showed that there was a partial-thickness tear along the

articular surface of the supraspinatus tendon and an intrasubstance punctate tear in the

infraspinatus, as well as fluid in the bursae. Id. at 6-7. The April 26 MRI of the lumbar spine

showed that there was a normal lordotic curvature but disc herniations at the L2-L3 and L5-S1

levels and disc bulging at the L3-L4, L4-L5, and L5-S1 levels. Id. at 3-5.

## II.   APPLICABLE LEGAL PRINCIPLES

### A.   Standard of Review

The scope of review in an appeal from a Social Security disability determination involves

two levels of inquiry. First, the court must review the Commissioner's decision to decide

whether the Commissioner applied the correct legal standard when determining that the plaintiff

was not disabled. See Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999). Failure to apply the

correct legal standard is grounds for reversal of the ruling. See Townley v. Heckler, 748 F.2d

109, 112 (2d Cir. 1984). Second, the court must decide whether the Commissioner's decision

was supported by substantial evidence. See Green-Younger v. Barnhart, 335 F.3d 99, 105-06

(2d Cir. 2003). "Substantial evidence means such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." Id. at 106 (internal quotation marks and citations

omitted). When determining whether substantial evidence supports the Commissioner's

decision, the court must "carefully consider[] the whole record, examining evidence from both

sides." Tejada, 167 F.3d at 774 (citing Quinones v. Chater, 117 F.3d 29, 33 (2d Cir. 1997)). "It

is not the function of a reviewing court to decide *de novo* whether a claimant was disabled."

Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (citation omitted). If the "decision rests on

adequate findings supported by evidence having rational probative force, [a court] will not

substitute [its own] judgment for that of the Commissioner." Veino v. Barnhart, 312 F.3d 578,

586 (2d Cir. 2002). Moreover, the ALJ "has an obligation to develop the record in light of the

non-adversarial nature of the benefits proceedings, regardless of whether the claimant is

represented by counsel." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citations omitted).

### B.    Determining Disability

In the context of disability benefits, the Act defines "disability" as the inability "to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

In evaluating a disability claim, regulations issued pursuant to the Act set forth a five-step

process that the Commissioner must follow. See 20 C.F.R. § 404.1520(a)(4).

First, the Commissioner will consider whether the claimant is working in "substantial

gainful activity." Id. at § 404.1520(a)(4)(i),(b). If the claimant is engaged in "substantial gainful

activity," then the Commissioner will find that the claimant is not disabled. Id. Second, the

Commissioner considers the medical severity of the claimant's impairments. Id. at §

404.1520(a)(4)(ii). The claimant's impairment will not be deemed severe "[i]f [he or she] do[es]

not have any impairment or combination of impairments which significantly limits [his or her]

physical or mental ability to do basic work activities." Id. at § 404.1520(c). Third, if it is found

that the claimant's impairments are severe, the Commissioner will determine if the claimant has

an impairment that meets or equals one of the impairments presumed severe enough to render

19

one disabled, listed in Appendix 1 to Part 404, Subpart P of the Social Security Regulations. Id.
at § 404.1520(a)(4)(iii),(d). If the claimant's impairments are not on the list, the Commissioner
considers all the relevant medical and other evidence and decides the claimant's residual
functional capacity. Id. at § 404.1520(e). Then, the Commissioner proceeds to the fourth step to
determine whether the claimant can do his or her past relevant work. Id. at §
404.1520(a)(4)(iv),(e)-(f). Finally, if it is found that the claimant cannot do his or her past
relevant work, the Commissioner will consider the claimant's residual functional capacity, age,
education, and work experience to see if he or she can make an adjustment to other work. Id. at
§ 404.1520(a)(4)(v),(g).

   The claimant bears the burden of proof on the first four steps of this analysis. DeChirico
v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998) (citation omitted). If the ALJ concludes at an
early step of the analysis that the claimant is not disabled, he or she need not proceed with the
remaining steps. Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 2000). If the fifth step is
necessary, the burden shifts to the Commissioner to show that the claimant is capable of other
work. DeChirico, 134 F.3d at 1180 (citation omitted).

**III.   DISCUSSION**

   In deciding Plaintiff's case, the ALJ applied the required five-step sequential analysis set
forth in the regulations. First, the ALJ found that Plaintiff had engaged in substantial gainful
activity during the period of November 17, 2004, through April 18, 2006. AR 344. Second, the
ALJ determined that Plaintiff's degenerative disc disease and history of cervical and lumbar disc
herniations and strains were severe impairments within the meaning of 20 C.F.R. § 404.1520(c).
Id. Third, the ALJ decided that Plaintiff's impairments did not meet or medically equal the
impairments listed in Appendix 1 to Subpart P of Part 404 of the Social Security Regulations.

Id. Therefore, the ALJ went on to determine Plaintiff's residual functional capacity and

concluded that Plaintiff had the residual functional capacity to perform light work with

occasional postural limitations. Id. More specifically, the ALJ found that Plaintiff could

lift/carry objects weighing up to up to 20 pounds occasionally and up to 10 pounds frequently;

could sit, stand, and/or walk for a total of 6 hours in an 8-hour workday; and had occasional

postural limitations relative to stooping, crouching, kneeling, crawling, and climbing. Id.

     At the fourth step in the analysis, the ALJ found that Plaintiff was unable to perform his

past relevant work as both a sanitation collector and tent part assembler. Id. 346-47. The ALJ

noted that "these jobs are generally performed at the very heavy and medium exertional levels,"

but Plaintiff had the residual functional capacity for only light work. Id. 347.

     At the fifth step in the analysis, the ALJ relied upon the medical vocational guidelines

(the "grids") contained in 20 C.F.R. Part 404, Subpart P, Appendix 2, as a framework for

decision making, taking into account Plaintiff's residual functional capacity, age, education, and

work experience. Id. The ALJ noted that Plaintiff was a "younger individual," i.e., he was less

than 50 years old at the time of the ALJ's decision; that he had a high school equivalency

education and was able to communicate in English; and that transferability of job skills had no

bearing on the determination of disability. Id. Stating that if Plaintiff had the residual functional

capacity to perform the full range of light work, then Medical-Vocational Rule 202.21 would

direct a finding of "not disabled," the ALJ went on to state that "the additional limitations have

little or no effect on the occupational base of unskilled light and sedentary work," and therefore a

finding of "not disabled" was "appropriate under the framework" of that Medical-Vocational

Rule. Id. The ALJ additionally found that "[e]ven if the evidence supported a finding that

[Plaintiff] was limited to no greater than sedentary work with occasional postural limitations, a

finding of 'not disabled' would be rendered within the framework of Medical-Vocational Rules 201.21 and 201.28." Id. 348. Therefore, Plaintiff was not entitled to a period of disability or disability insurance benefits under the Act. Id.

In his motion papers, Plaintiff contends that the ALJ applied incorrect legal standards in analyzing Plaintiff's treating physicians' medical opinions and in failing to consider Plaintiff's subjective testimony about his pain; the ALJ's decision that Plaintiff was not disabled was not supported by substantial evidence; and there is new evidence of the worsening condition of Plaintiff's neck, back, and left shoulder. In his cross-motion, the Commissioner contends that the ALJ's decision was supported by substantial evidence; the ALJ applied the correct legal standards; and the additional evidence provided by Plaintiff does not warrant a remand.

### A.   The Assessment of the Medical Opinion Evidence of Record

Under the Social Security regulations, a treating physician's opinion regarding the nature and severity of a claimant's impairments will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(d)(2)[9]; Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995). If a treating physician's opinion is not given controlling weight, then various factors are applied in determining what weight to give it: (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment relationship; (iii) the extent to which the medical source provides relevant evidence to support an opinion; (iv) the extent to which the opinion is consistent with the record

---

[9]The discussion of the treating physician rule is based on the version of the rule that was in effect throughout the agency proceedings. However, during the pendency of this appeal, the Social Security Administration revised its regulations relating to the treating physician rule, and the subsections of 20 C.F.R. § 404.1527 have since been reordered.

as a whole; (v) whether the opinion is given by a specialist; and (vi) other factors which may be brought to the attention of the ALJ. Id. at § 404.1527(d)(2)(i)-(ii),(d)(3)-(d)(6). The Commissioner "will always give good reasons in [his or her] notice of determination or decision for the weight [he or she] give[s] [a claimant's] treating source's opinion." Id. at § 404.1527(d)(2). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). Certain findings, however, such as whether a claimant is disabled and cannot work, are reserved to the Commissioner. 20 C.F.R. § 404.1527(e)(1). In other words, "a treating physician's statement that the claimant is disabled cannot itself be determinative." Snell, 177 F.3d at 133.

Plaintiff argues that the ALJ improperly disregarded the opinions of his treating physicians, Dr. Polifrone and Dr. Starace. "While the opinions of a treating physician deserve special respect, they need not be given controlling weight where they are contradicted by other substantial evidence in the record. Genuine conflicts in the medical evidence are for the Commissioner to resolve." Veino, 312 F.3d at 588 (citations omitted). In this case, the ALJ determined that Dr. Polifrone's finding that Plaintiff had a "significantly less than sedentary residual functional capacity" was not supported by clinical medical evidence. Id. 346, 450-56. As explained by the ALJ, radiographic EMG/NCV studies showed "only mild clinical findings, with the most recent cervical spine MRI evidencing no disc herniations." Id. 346; see id. 441-42, 444.[10] The ALJ also cited the evaluation of Dr. Robinson, a consultative examiner, who "noted blatant inconsistencies and symptom amplification." Id. 346; see id. 272. Moreover, the ALJ

---

[10]The January 5, 2000, lower extremity electrodiagnostic study subsequently submitted to the Appeals Council does not undermine the ALJ's decision, since it reported only that "[f]indings *may be suggestive* of a right L4 and/or L5 radiculopathy." AR 471-72 (emphasis added).

noted that Dr. Polifrone's view that Plaintiff had suffered these limitations since April 2, 1999, was "belied by [Plaintiff's] substantial gainful activity during the interim period." Id. 346, 481-84, 488-89. Indeed, the ALJ elsewhere stated that "[m]ost noteworthy" was the fact that Plaintiff's "orthopedic condition has remained essentially clinically unchanged since the mid-1990's, yet he was nevertheless able to engage in substantial gainful activity from 1997-1999 and 2004-2006." Id. 346.[11] Thus, the ALJ found that Dr. Polifrone's opinions were not entitled to "significant probative weight." Id.

Similarly, although the ALJ noted that Dr. Starace had opined that Plaintiff was "totally disabled and unable to work in his occupation," id. 341, the ALJ found that this opinion was not worthy of "substantial credence" since it was "not supported by [Dr. Starace's] own evaluation results, which included no motor, sensory or reflex deficits of any kind." Id. 346; see id. 258. Furthermore, the ALJ reasoned that Dr. Starace treated Plaintiff for only a few months, not long enough to "constitute a significant longitudinal treatment history." Id. 346; see id. 251-58. Furthermore, Dr. Starace's opinion that Plaintiff was disabled is not determinative because it is for the Commissioner to decide whether Plaintiff is disabled. 20 C.F.R. § 404.1527(e)(1); Snell 177 F.3d at 133. Regardless, Dr. Starace noted in several instances that Plaintiff was disabled only from employment as a sanitation worker, not disabled from all types of employment. See AR 251, 254, 255, 258.[12]

----

[11]For example, the November 6, 2000, MRI of the lumbosacral spine, which showed a small central posterior disc herniation at the L5-S1 level, showed no change from prior MRIs done on February 1, 1994, and February 15, 2000. AR 286, 299.

[12]The ALJ also specifically discounted the opinion of Dr. Mann, the orthopedic consultative examiner, stating that Dr. Mann's assessment that Plaintiff could perform "no greater than sedentary work with a sit/stand option" was "not fully consistent with the doctor's own one-time examination findings, nor the clinical findings contained in the radiographic and

Moreover, in reaching his determination regarding Plaintiff's residual functional capacity, the ALJ did rely on the examination findings of Dr. Starace, as well as those of Drs. Robinson, Puri, and Stern, all of whom found Plaintiff "to be essentially fully neurologically intact." Id. 344; see id. 257-58, 271-72, 306-09, 443. Thus, Dr. Starace had reported that Plaintiff had no objective motor, sensory, or deep tendon reflex deficits, id. 258, and as of his final appointment with Dr. Starace in December, 1999, Plaintiff was "neurovascularly unchanged." Id. 251. Dr. Robinson, a consultative examiner, who examined Plaintiff in March, 2000, found that Plaintiff had low back pain "likely due to an annular tear and degenerative disk and joint disease," but found "no evidence of neurologic deficit." Id. 272. Rather, Dr. Robinson opined that Plaintiff's presentation was "significantly out of proportion to what would be anticipated from his physical exam and the MRI results." Id. Dr. Puri, another consultative examiner, who examined Plaintiff in January, 2001, found that Plaintiff had normal ranges of motion in both his neck and his upper extremities and that he had full strength and no sensory deficit in his upper extremities. Id. 308. Dr. Puri noted that Plaintiff had decreased range of motion in his lumbar spine, with some spinal tenderness, but he had no muscle spasm. Id. Plaintiff's straight leg raising was negative bilaterally. Id. There was no sensory deficit in the lower extremities, except for a mild decrease in sensation to pinprick on the right leg, and muscle strength was full. Id. Dr. Stern examined Plaintiff in October, 2001, and noted that Plaintiff's primary complaints were "neck pain plus nuchal pain and mid thoracic pain," but while Plaintiff's MRI showed a small disc herniation at C3-4, Dr. Stern "would be hard put to ascribe [Plaintiff's] symptoms" to that herniation. Id. 443.

---

EMG/NCV studies within the evidence of record." AR 346. Dr. Mann had reported that Plaintiff had full range of motion and 5 plus motor strength in his upper and lower extremities, sensation was intact, and there were no muscle atrophies. Id. 421-22.

Although the November 20, 2000, MRI of the cervical spine showed that Plaintiff had a central posterior disc herniation at the C3-C4 level, id. 300, the disc herniation was no longer present on a cervical MRI performed in November, 2001, a month after Plaintiff's examination by Dr. Stern. Id. 444. In sum, there is substantial medical evidence in the record to support the ALJ's determination. See Punch v. Barnhart, No. 01 Civ. 3355, 2002 WL 1033543, at *12 (S.D.N.Y. May 21, 2002) ("[E]ven the report of a consultative physician can constitute substantial evidence.") (citation omitted).

To the extent that the ALJ credited the conclusions of the state agency medical consultants in arriving at his determination of Plaintiff's residual functional capacity, see AR 344 ("This assessment also comports with the conclusions of the state agency medical consultants, as previously rendered," citing the June 24, 1999, assessment, the May 16, 2000, assessment of Dr. Bodnar, and the March 26, 2001, assessment[13]), the "opinion of a non-examining medical expert can also serve as substantial evidence and override the opinion of the treating physician pursuant to the treating physician regulations." Punch, 2002 WL 1033543, at *12 (citing 20 C.F.R. § 404.1527); see AR 263-70 (June 24, 1999, assessment found that Plaintiff retained the physical residual functional capacity for light work), 275-82 (Dr. Bodnar found that Plaintiff retained the physical residual functional capacity for light work with occasional postural limitations and her finding was affirmed by Dr. Auerbach). Therefore, the opinions of the state agency medical consultants, which were supported by substantial medical evidence in the record, themselves constitute substantial evidence supporting the ALJ's decision.

---

[13]The March 26, 2001, assessment was completed by a state agency adjudicator, not a state agency medical consultant. See AR 317. Nonetheless, it is consistent with the assessments of the state agency medical consultants.

26

In sum, the ALJ applied the proper legal standards in evaluating the medical opinion

evidence of record.  Furthermore, based upon a review of the entire record, as summarized in

detail in Sections I.B. and I.C., supra, as well as in the ALJ's Decision, see AR 340-44, the ALJ's

conclusion regarding Plaintiff's residual functional capacity is supported by substantial evidence.

**B.**     **The Assessment of Plaintiff's Credibility**

Plaintiff argues that the ALJ erred by not properly considering his subjective complaints

of pain and other symptoms.[14]  However, an ALJ's credibility findings are entitled to deference

by a reviewing court.  See Tejada, 167 F.3d at 775-76 (upholding ALJ's credibility

determination, citing with approval Pascariello v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y.

1985), in which the district court noted "that after weighing objective medical evidence, the

claimant's demeanor, and other indicia of credibility, the ALJ, in resolving conflicting evidence,

may decide to discredit the claimant's subjective estimation of the degree of impairment."); see

also Aponte v. Sec'y, Dep't of Health & Human Servs, 728 F.2d 588, 591 (2d Cir. 1984) ("It is

the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts

and to appraise the credibility of witnesses, including the claimant.  If the [Commissioner's]

findings are supported by substantial evidence, the court must uphold the ALJ's decision to

discount a claimant's subjective complaints of pain.") (internal quotation marks and citation

---

[14]When making a disability determination, the ALJ should consider a claimant's
subjective complaints of pain along with the objective medical evidence presented.  Pascariello
v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985).  Factors that the ALJ considers in addition
to the objective medical evidence in assessing the credibility of the claimant's statements include
the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's
pain or other symptoms; precipitating and aggravating factors; medications that the claimant has
taken; treatment, other than medication, that the claimant uses or has used to alleviate his or her
pain or other symptoms; any measures that the claimant uses or has used to relieve his or her
pain or other symptoms; and any other factors concerning the claimant's functional limitations
and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c)(3).

omitted).

In this case, the ALJ considered Plaintiff's subjective complaints in accordance with 20

C.F.R. § 404.1529. AR 345-46. The ALJ noted that Plaintiff was independent with respect to

his personal care and could drive a car and take public transportation and that Plaintiff worked

from November, 2004, through April, 2006. Id. 346.[15] The ALJ also noted that Plaintiff

received only "conservative and sporadic medical treatment, consisting primarily of chiropractic

modalities," and that during most of Plaintiff's alleged periods of disability, Plaintiff used only

over-the-counter medications or no pain medication at all. Id. Plaintiff's latest MRI of his

cervical spine showed no disc herniations, and Dr. Robinson's report suggested that Plaintiff may

have been exaggerating his pain and other symptoms. Id.; see also id. 444 (Dr. Stern noted that

Plaintiff's MRI showed "a small disc herniation at C3-4, which [he] would be hard put to ascribe

to [Plaintiff's] symptoms."). Furthermore, the ALJ noted that because Plaintiff received

Workers' Compensation benefits from 1999 through 2004, and his live-in girlfriend was

supporting him financially at the time of the hearing, Plaintiff had no incentive to work during

the periods of claimed disability. Id. 346. Consequently, the ALJ found, based on substantial

evidence in the record, that Plaintiff's "statements concerning the intensity, persistence and

limiting effects of [his] symptoms [were] not entirely credible." Id. There is no basis to disturb

this finding, which is entitled to deference by this Court.

---

[15]Moreover, the ALJ elsewhere noted that Plaintiff had stopped working as a tent
assembler in April, 2006, "due to a right rotator cuff injury . . . [which] was different tha[n] the
[injury] that caused him to stop working in 1999." AR 344. In other words, Plaintiff's back and
neck problems were not the reason why he ceased working at that time.

**C.     The Determination of Disability**

At the fifth step in his analysis, the ALJ took into account Plaintiff's residual functional

capacity, age, education, and work experience, in conjunction with the medical vocational

guidelines (the "grids") contained in 20 C.F.R. Part 404, Subpart P, Appendix 2, in determining

whether or not Plaintiff was disabled.  AR 347.  Given his conclusion that Plaintiff had the

residual functional capacity to perform light work with occasional postural limitations and that

"the additional limitations have little or no effect on the occupational base of unskilled light and

sedentary work," id., the ALJ properly applied the grids as a framework for decision making.

See 20 C.F.R. Part 404, Subpart P, Appendix 2, Section 200.00(e)(2); Bapp v. Bowen, 802 F.2d

601, 606 (2d Cir. 1986) (vocational expert testimony not required at fifth step if ALJ determines

that the range of work claimant could perform was not significantly diminished by nonexertional

limitations).  In his motion papers, Plaintiff notes that the ALJ incorrectly stated that Plaintiff

had a high school equivalency education, id. 347, when Plaintiff himself testified that he had

only completed the 10th grade.  Id. 23.  However, even if Plaintiff had only a limited education as

defined in 20 C.F.R. § 404.1564(b)(3) ("We generally consider that a 7th grade through the 11th

grade level of formal education is a limited education."), Plaintiff would still be found "not

disabled" within the framework of Medical-Vocational Rule 202.18.  Likewise, under the ALJ's

alternate finding that Plaintiff was limited to no greater than sedentary work with occasional

postural limitations, Plaintiff would still be found "not disabled" within the framework of

Medical-Vocational Rules 201.19 and 201.25.[16]

---

[16]"If someone can do light work, we determine that he or she can also do sedentary work,
unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long
periods of time."  20 C.F.R. § 404.1567(b).  Since the ALJ did not find that Plaintiff suffered
from any such additional limiting factors, he considered Plaintiff's ability to perform sedentary

29

### D.   The Consideration of New Evidence

A court can order the Commissioner to consider new evidence if certain conditions are met. See 42 U.S.C. § 405(g), sentence six ("The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . ."). A claimant for disability insurance benefits must show that the new evidence is truly "new and not merely cumulative of what is already in the record." Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988) (internal quotation marks and citation omitted). A claimant must also show that the evidence is material, i.e., "both relevant to the claimant's condition during the time period for which benefits were denied and probative" and that the evidence gives rise to a reasonable possibility that it would have caused the case to be decided differently. Id. Finally, a claimant must show good cause for not presenting the evidence earlier. Id.

Plaintiff maintains that the additional evidence submitted with his motion papers, comprised of an October 9, 2008, report from Dr. Polifrone and MRIs of the lumbosacral spine and left shoulder[17] from April, 2008, prove that his neck, back, and shoulder pain was worsening. However, Plaintiff has failed to make the required showing that the new evidence is material. Plaintiff's period of alleged disability closed on April 27, 2007, the date of the ALJ's decision; this evidence relates to Plaintiff's condition a year or more later; and Plaintiff has failed to show

work as well in deciding that Plaintiff was not disabled.

[17]Notably, Plaintiff had testified at the administrative hearing on April 19, 2007, that he had stopped working as a tent part assembler in April, 2006, because of a rotator cuff injury in his **right** shoulder. AR 489-90.

how the new evidence is "both relevant to [his] condition during the time period for which benefits were denied and probative." Consequently, Plaintiff's additional evidence is not a basis for a remand under 42 U.S.C. § 405(g).

## CONCLUSION

For the foregoing reasons, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff's motion (Docket # 12) should be denied, the Commissioner's cross-motion (Docket # 14) should be granted, and the case should be dismissed.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(d), or a total of seventeen (17) days, see Fed. R. Civ. P. 6(a), from the date hereof, to file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of The Honorable Colleen McMahon at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to the chambers of the undersigned at the United States Courthouse, 300 Quarropas Street, White Plains, New York 10601.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge McMahon.

Date:   March 12 2013
        White Plains, New York

Respectfully submitted,

Lisa Margaret Smith
United States Magistrate Judge
Southern District of New York

Copies of the foregoing report and recommendation have been sent to the following:

The Honorable Colleen McMahon, U.S.D.J.

Irwin B. Silverman, Esq.
166 East Central Avenue
Spring Valley, New York 10977

Leslie A. Ramirez-Fisher Esq.
United States Attorney's Office
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007